**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALINA RENERT, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | Case No. 15-cv-1853 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| KING.COM INC., a Delaware corporation, KING.COM LTD. a Malta corporation, KING DIGITAL ENTERTAINMENT PLC, an Ireland company, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Alina Renert ("Plaintiff") brings this Class Action Complaint against Defendants King.com, Inc., King.com, Ltd., and King Digital Entertainment, PLC, (collectively, "Defendants" or "King") on behalf of herself and all others similarly situated, and complains and alleges upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## I.      NATURE OF THE ACTION

1.      King is a conglomerate of leading interactive entertainment companies for the mobile world. Defendants jointly create and operate mobile games played by millions of people throughout the world.

2.      One of King's games is "Candy Crush Saga" ("Candy Crush" or the "Game").

3.      In 2013, Candy Crush grossed an estimated $1.9 billion in revenue. This massive revenue was generated through "In-App Purchases"—transactions where a player pays money

for virtual items that can be used in the Game.[1]  For example, in Candy Crush, a player can buy five "extra lives" for $.99.  The lives are then saved for future use by the player.

4.      Accordingly, each player's Candy Crush game has an account that holds virtual items with cash value.  If a player had five lives in her Game account, then it would hold assets worth $.99.

5.      In or around 2013, King began unilaterally removing lives (that have a cash value) from players' Game accounts. This removal, or purge, was done without prior knowledge or consent of the players, including Plaintiff.

6.      As a consequence of King's conduct, players bought replacement lives through In-App Purchases as substitutes for the lives improperly removed by King ("Replacement Lives"), thus enriching King. This case challenges such intentional profiteering at the expense of consumers.

7.      Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1830 ("CFAA"), Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, ("ICFA"), and the Consumer Fraud Laws similar to that of Illinois under the facts particular to this case. In addition, Plaintiff asserts claims for breach of contract, or in the alternative unjust enrichment. Plaintiff seeks injunctive relief, monetary damages (including actual and punitive damages), and attorneys' fees.

---

[1] In King's Form 6-K report to the U.S. Securities and Exchange Commission, King states, "Our free-to-play business model depends on purchases of virtual items within our games, and our business, financial condition and results of operations will be materially and adversely affected if we do not continue to successfully implement this model." King Digital Entertainment PLC (2014). Interim Report (Form 6-K) (period ending June 30, 2014), *available at* http://investor.king.com/files/doc_financials/2014%20Q2/As-filed-Form-6-K_v001_z054qb.PDF.

## II.     JURISDICTION AND VENUE

8.     This Court has original jurisdiction over Count I pursuant to 28 U.S.C. § 1331, because the count arises under the laws of the United States. This Court has supplemental jurisdiction over Counts II-V pursuant to 28 U.S.C. § 1367, because King's conduct – giving rise to all Counts – forms part of the same case or controversy.

9.     Further, this Court has diversity jurisdiction over the claims in this action under 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action. Approximately 246.9 million individuals play Candy Crush.[2] On information and belief, King has injured at least 25 million individuals in the United States by removing or deleting lives that players earned by marketing for King ("Donated Lives") and causing the players to purchase Replacement Lives.[3] Each Donated and Replacement life is worth $0.20. Accordingly, the amount in controversy easily exceeds $5,000,000.

10.     The Court has personal jurisdiction over Defendants under the Illinois long-arm statute, 735 ILCS 5/2-209, because Defendants engaged in service activities within the State of Illinois. The Court also has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in the Complaint took place in and/or was directed toward this State. By operating the Game and transacting with Illinois consumers, Defendants have sufficient contacts in this State to render the exercise of jurisdiction by this Court permissible.

---

[2]Ian Sherr, *Candy Crush Saga Grew so Fast it Broke Usage Algorithm*, DIGITS WALL STREET JOURNAL BLOG (Aug. 30, 2013, 7:01 PM) http://blogs.wsj.com/digits/2013/08/30/candy-crush-saga-grew-so-fast-it-broke-usage-algorithm/?mod=WSJBlog&mod=&utm_medium=referral&utm_source=AlexLamondWordpress.

[3] *See infra* ¶¶38, 49 (defining Donated and Replacement Lives).

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

### III.     CHOICE OF LAW

*The Substantive Law of Illinois Applies to the Claims of the National Class*

12.     Illinois' substantive laws apply to the proposed National Class, as set forth in this Complaint, because Plaintiff properly brings this action in this District. A United States District Court sitting in diversity presumptively applies the substantive law of the state in which it sits. *Land v. Yamaha Motor Corp., U.S.A.*, 272 F. 3d 514, 516 (7th Cir. 2001).

13.     The Court may constitutionally apply Illinois' substantive laws to Plaintiff's claims and the claims of the National Class under the Due Process Clause of the Fourteenth Amendment, § 1, and the Full Faith and Credit Clause, Article IV, § 1, of the United States Constitution. The claims asserted by Plaintiff contain significant contact, or a significant aggregation of contacts, to ensure an adequate state interest and supports the choice of Illinois state law as just and reasonable.

14.     Defendants conduct substantial business in Illinois, providing Illinois with an interest in regulating Defendants' conduct under Illinois laws. Defendants' decision to regularly conduct business in Illinois and avail itself of Illinois' laws render the application of Illinois law to the claims at hand constitutionally permissible.

15.     The injury to Plaintiff and to a significant number of members of the proposed Class by virtue of the conduct alleged, occurred in Illinois. Plaintiff resides in Illinois and purchased King's Replacement Lives in Illinois. A substantial number of the proposed Nationwide Class reside in Illinois and purchased King's Replacement Lives in Illinois.

16.     The application of Illinois law to the members of the proposed National Class is also appropriate under Illinois' choice-of-law rules, because Illinois has significant contacts with the claims of the Plaintiff and each of the members of the proposed National Class.

## IV.    PARTIES

*Plaintiff*

17.     Plaintiff is an individual domiciled in Cook County, Illinois. For purposes of 28 U.S.C. § 1332, Plaintiff is a citizen of the State of Illinois.

*Defendants*

18.     Defendant King.com Inc. is a corporation organized in and existing under the laws of the State of Delaware with its principal place of business located in San Francisco, California. For purposes of 28 U.S.C. § 1332, King.Com Inc. is a citizen of the States of California and Delaware.

19.     Defendant King.com Inc. is a subsidiary of Defendant King Digital Entertainment PLC.

20.     At all relevant times, Defendant King.com Inc. acted under the control and direction of its parent, Defendant King Digital Entertainment PLC.

21.     Defendant King.com Ltd. is a corporation organized in and existing under the laws of the Republic of Malta with its principal place of business located in Malta.  For purposes of 28 U.S.C. § 1332, King.com Ltd. is a citizen of the Republic of Malta.

22.     At all relevant times, Defendant King.com Ltd. operated the website for Candy Crush.

23.     At all relevant times, Defendant King.com Ltd acted under the control and direction of Defendant King Digital Entertainment PLC.

24.     Defendant King Digital Entertainment PLC is a corporation organized in and existing under the laws of Ireland with its principal place of business located in Ireland. For purposes of 28 U.S.C. § 1332, King Digital Entertainment PLC is a citizen of Ireland.

25.     Defendant King Digital Entertainment PLC developed Candy Crush.

26.     Defendant King Digital Entertainment PLC controls the operation of and advertising of Candy Crush through Defendants King.com Ltd. and King.com Inc.

## V.     FACTUAL BACKGROUND

*Candy Crush's Popularity*

27.     Candy Crush is a wildly popular mobile phone app, by some measures even more popular than Twitter.[4]  A screen shot of the game follows:



28.     Candy Crush boasted an average of 93 million daily active users in December, 2013.[5] In the fourth quarter of 2013, Candy Crush gamers played over 1 billion games per day.[6]

---

[4] Seth Fiegerman, *'Candy Crush' Is Bigger Than Twitter, But Probably Not For Long*, MASHABLE (Feb. 18, 2014), http://mashable.com/2014/02/18/candy-crush-ipo-stats.

29. Candy Crush has also generated staggering revenues for King. In the fourth quarter of 2013, the Game generated over $450 million in revenue.[7] Currently, King reaps an estimated $859,041 in daily revenue from the Game.[8]

***Overview of Candy Crush***

30. Candy Crush is played on mobile devices such as iPhones, iPads, and Androids.

31. The Game is classified as a match-making puzzle game, in which the objective is for players to earn points by clearing icons from the board.

32. Players clear icons by matching three or more of the same icon in various configurations, as illustrated below:



33. Once a certain amount of icons have been cleared, players advance to the next level.

34. Players have a limited amount of turns ("Moves") to remove icons.

---

35.     If players fail to remove the requisite icons from the board within the specified number of Moves, they lose one of their in-game lives and are required to repeat the level.

***The Value of Lives***

36.     "Lives" are important in Candy Crush because they are limited.[9]

37.     Players start with five lives and are awarded one free life every thirty minutes (the "Free Life Option"), up to a limit of five.

38.     Under the Free Life Option, players who have lost all of their lives must wait thirty minutes before they can play again.

39.     Many players, however, do not want to wait thirty minutes for additional lives due to the addictive nature of the Game. Indeed, major news companies, such as Time, Inc., have reported on the Game's "addictiveness:"

> Perhaps the most genius element of *Candy Crush* is its ability to make you long for it. You get five chances (lives) to line up the requisite number of candy icons. Once you run out of lives, you have to wait in 30-minute increments to continue play. Or, if you're impatient, you can pay to get back in the game — which is why it's bringing in so much revenue. "You can't just play all the time. You run out of lives," says Andy Jarc, 22, one of the few players to reach level 440 in the game. "So the fact that they kind of constrain you — the whole mantra, 'You always want what you can't have.' I can't have more lives and I want them."[10]

40.     Candy Crush's designers have made similar comments:

> I think it makes the game more fun long term . . . . If you have a game that consumes a lot of mental bandwidth, **you will continue playing it without noticing that you're hungry or need to go to the bathroom.**[11]

41.     King provided two more options for players to obtain additional lives, aside from the Free Life Option.

---

[9] *Mobile Game Support*, CANDY CRUSH SAGA, http://www.candycrushsaga.com/candy-crush-saga-faqs/en (last accessed Jun. 10, 2014).

[10] Eliana Dockterman, *Candy Crush Saga: The Science Behind Our Addiction*, TIME (Nov. 15, 2013), http://business.time.com/2013/11/15/candy-crush-saga-the-science-behind-our-addiction.

[11] *Id.* (quoting Tammy Palm, one of the Game's designers) (emphasis added).

42.     The first alternative option is for players to purchase additional lives while in the Game through In-App purchases (the "Purchase Option").

43.     The second alternative option is for players to connect their Candy Crush accounts to their Facebook accounts. Players may then request and receive additional lives ("Donated Lives") from their Facebook friends who also have the Game installed on their mobile devices (the "Facebook Option").

44.     If a player's Facebook friends do not have Candy Crush installed on their mobile devices, the friends are prompted to download and install the Game.

45.     Thus, under the Facebook Option, King receives a benefit from players marketing the Game to their friends. In so doing, King is able to pass on marketing costs[12] to consumers.

46.     As one marketing commentator put it:

> Candy Crush is the king of social media sharing. If you want to play the game, you need to connect with your Facebook account. If you want to advance past a particular checkpoint, you need to get three Facebook friends who have downloaded the game to help you move on. If you run out of lives, you can ask Facebook friends for more.
>
> Whether you play Candy Crush Saga or not, you can't deny that the game utilizes some great best-practices for inbound marketers.[13]

47.     Under either the Purchase Option or the Facebook Option, lives have an economic and ascertainable value equal to approximately $0.20.

***Damage to Plaintiff and the Class***

48.     Plaintiff began playing Candy Crush on her iPad mobile device in our around early 2014.

---

[12] King Digital Entertainment PLC (2014). Interim Report (Form 10-K) (period ending Jun, 30, 2014), *available at* http://investor.king.com/files/doc_financials/2014%20Q2/As-filed-Form-6-K_v001_z054qb.PDF.

[13] Caitlin Shanly, *5 Inbound Marketing Practices You Can Learn from Candy Crush Saga*, IMPACT BRANDING & DESIGN BLOG (Aug. 6, 2013), http://www.impactbnd.com/blog/5-inbound-marketing-practices-you-can-learn-from-candy-crush-saga.

49.     In or around early 2014, Plaintiff connected Candy Crush to her Facebook account.

50.     When Plaintiff ran out of lives, she utilized the Facebook Option by periodically asking her Facebook friends for Donated Lives.

51.     On information and belief, some of Plaintiff's Facebook friends downloaded and installed Candy Crush as a result of Plaintiff's request.

52.     Plaintiff received her Donated Lives and exited Candy Crush.

53.     However, upon returning to the Game, Plaintiff found that the Donated Lives were gone.

54.     This improper removal of the Donated Lives caused Plaintiff to purchase additional lives for $0.99 through the Purchase Option ("Replacement Lives") on at least one occasion in or around January or February 2014.

55.     Other Candy Crush players reported having the same problem. Below are excerpts of consumer complaints posted on Defendants' own message boards:

> Had 3 lives on my phone a couple hours ago sent from friends but now they are gone.  Why does this keep happening?  I want my lives back!!!! – apcolter.[14]
> Keep loosing lives. Just lost 50. A few days ago, lost 22. Several times lost 5 to 10. Feel cheated. Please fix this. – vlr.[15]
>
> I concur. They take them away on purpose so they have easier access to your wallet. They make a million a day w this game but they are greedy and want more. My 42 lives I had from FB friends just vanished into thin air. Guess what,

---

[14] *Candy Crush Saga, Bugs & Known Issues, Losing Lives Saved*, KING FORUMS (Sept. 17, 2013, 5:43 AM), https://forums.king.com/en/forum/candy-crush-saga/bugs-known-issues-ccs/losing-lives-saved?p=5#.U5c_2HlOUic.

[15] *Candy Crush Saga, Bugs & Known Issues, Losing Lives Saved*, KING FORUMS (Sept. 17, 2013, 11:35 AM), https://forums.king.com/en/forum/candy-crush-saga/bugs-known-issues-ccs/losing-lives-saved?p=5#.U5c_2HlOUic.

the app will be deleted if they aren't returned. King does not give a crap about anything other than getting your money. – johnthegreen.[16]

Why in the [] (double hockey sticks) don't you work with Facebook so that we can use the lives we get from friends. As it is right now why even bother to send friends life and xtra moves if they just go bye bye!!!!!!! – bjwalter.[17]

56.    Players have also reported the problem on websites hosted by other players:

*For the past few weeks, we have been receiving more and more friends telling us that they are having lives missing from the game and their envelope is gone!*

Some even have hundreds of lives received and accumulated over time from friends . . . . We have confirmed that there is indeed a bug on this, and it happens for all platforms from mobile devices like Android, iPhone and iPad to Facebook.

*With everyone putting on pressure with the developers on this, we hope that they will look into it seriously and consider doing a refund for all the lost lives! Crushers Unite!*[18]

57.    King designed or altered Candy Crush to remove the Donated Lives, but failed to inform its players.

58.    Numerous other players, who had their Donated Lives removed by King, purchased Replacement Lives.

59.    King unlawfully procured millions of dollars as a direct result of removing Donated Lives.

---

[16] *Candy Crush Saga, Bugs & Known Issues, Losing Lives Saved*, KING FORUMS (Sept. 17, 2013, 3:44 AM), https://forums.king.com/en/forum/candy-crush-saga/bugs-known-issues-ccs/losing-lives-saved?p=5#.U5c_2HlOUic.

[17] *Candy Crush Saga, Bugs & Known Issues, Losing Lives Saved*, KING FORUMS (Aug. 18, 2013, 10:37 PM), https://forums.king.com/forum/candy-crush-saga/bugs-known-issues-ccs/losing-lives-saved/?categoryPermalink=candy-crush-saga&forumPermalink=bugs-known-issues-ccs&forumThreadPermalink=losing-lives-saved&device=smartphone&p=4.

[18] *Missing Lives Bug Lost Envelope In Candy Crush Saga*, CANDYSAGACRUSH.COM (Jul. 10, 2013), http://www.candysagacrush.com/missing-lives-bug-lost-envelope-in-candy-crush-saga.

## VI.    CLASS ALLEGATIONS

60.    Plaintiff brings Counts I, III, and IV, as set forth below, on behalf of herself and as a class action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

### National Class

All individuals in the United States whose Donated Lives were removed from their Game accounts by Defendants and who then purchased Replacement Lives.

Excluded from the National Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Classes; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

61.    Plaintiff brings Count II, as set forth below, on behalf of herself and as a class action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

### Multi-State Class

All individuals in the Consumer Protection States[19] whose Donated Lives were removed from their Game accounts by Defendants and who then purchased Replacement Lives.

Excluded from the Multi-State Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Classes; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

62.    Plaintiff brings Count V, as set forth below, on behalf of herself and as a class action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

---

[19] *See supra*, ¶ 92 (providing a list of the Consumer Protection States).

**Illinois Subclass**
All individuals residing in Illinois whose Donated Lives were removed from their Game accounts by Defendants and who then purchased Replacement Lives.

Excluded from the Illinois Subclass are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Classes; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

63. References to the "Class" or the "Classes" refers to both of the above stated Classes, unless otherwise indicated.

64. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

65. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all Class members is impracticable. On information and belief, there are thousands of consumers who have been damaged by Defendants' wrongful conduct as alleged herein. The precise number of Class members and their addresses is presently unknown to Plaintiff, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

66. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. whether Defendants offer the Facebook Option for players to acquire Donated lives;

b. whether Defendants removed Donated Lives;

c. whether Plaintiff and the Classes purchase of Replacement Lives as a result of Defendants' conduct;

d. whether Defendants retained any benefit by removing Donated Lives;

e. whether Defendants would be unjustly enriched by retaining any benefit;

f. whether Defendants' conduct constitutes breach of an implied contract;

g. whether Defendants' conduct constitutes unfair and deceptive trade practices;

h. whether Defendants intended Plaintiff and the Class to rely on Defendants' deceptive or unfair practices;

i. whether Defendants knew Plaintiff's and the Classes' Donated Lives were being removed; and

j. whether Plaintiff and the Class are entitled to damages, injunctive relief, or other equitable relief.

67. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above.

68. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class members she seeks to represent; she has retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by the Plaintiff and her counsel.

69. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other

Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

70.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CLAIMS ALLEGED

### COUNT I
### Violation of 18 U.S.C. § 1030, the Computer Fraud and Abuse Act
### (On Behalf Plaintiff and the National Class)

71.     The allegations of paragraphs 1-70 are incorporated by reference and re-alleged as though fully set forth herein.

72.     The CFAA provides a private cause of action against anyone that "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C. §§ 1030(a)(2)(c), 1030(g).

73.     The CFAA also provides a private cause of action against anyone that:

(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C. §§ 1030(a)(5)(A)(B)(C), 1030(g).

74.     The CFAA allows for a private cause of action if there is a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i).[20]

75.     The term "damage" means "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).

76.     The term "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

77.     Plaintiff's and the other National Class members' tablets and mobile devices ("Protected Computers") are used in and affect interstate commerce by making purchases, including, but not limited to Replacement Lives,  and sending shipments and communications. Therefore, Plaintiff's and the other National Class members' mobile devices are "protected computers" under the CFAA.

78.     King removed or deleted Donated Lives from the Protected Computers of Plaintiff and the other National Class members without their knowledge or consent.

---

[20] This section provides for other situations, none of which is applicable to the case at bar.

79.     King removed or deleted the Donated Lives through the use of computer software that affected Plaintiff's and the other National Class members' Protected Computers and Game accounts in a single act.

80.     King's conduct caused the simultaneous or near simultaneous or rapid execution of software commands on Plaintiff's and the National Class members' Protected Computers and Game accounts.

81.     Lives in the Game have a cash value in the market place.

82.     By knowingly and intentionally removing the Donated Lives without or in excess of authorization, King:

   a. obtained information from Plaintiff's and the other Class members' Protected Computers regarding their Donated Lives, in violation of 18 U.S.C. 1030(a)(2)(C);

   b. committed fraud and obtained the value of Donated Lives from Plaintiff's and the other Class members' Protected Computers, in violation of 18 U.S.C. § 1030(a)(4).

   c. caused the transmission of a program, information, code, or command intending to cause damage to Plaintiff's and the other Class members' Protected Computers measured by the lost value of the Donated Lives, in violation of 18 U.S.C. § 1030(a)(5)(A).

   d. recklessly caused Plaintiff and the other Class members damage measured by the lost value of the Donated Lives, in violation of 18 U.S.C. § 1030(a)(5)(B); and

   e. caused Plaintiff and the other Class members to suffer damage and loss measured by the lost value of the Donated Lives, in violation of 18 U.S.C. § 1030(a)(5)(C).

83.     Plaintiff and the Class suffered damages in two respects.  First, something of cash value (the Donated Lives) was removed from their Protected Computers and Game accounts. Second, Plaintiff and the Class bought Replacement Lives as substitutes for the Donated Lives that King removed.

84.     King's conduct in removing the Donated Lives without or in excess of authorization caused damages to Plaintiff and the Class. Such damages qualify as a loss to one or more persons during any one year period and total well over $5,000.

## COUNT II
### Violation of State Consumer Protection Statutes
### (On Behalf of the Multi-State Class)

85.     The allegations of paragraphs 1-70 are incorporated by reference and re-alleged as though fully set forth herein.

86.     Plaintiff and each of the other members of the Multi-State Class acted as consumers, purchasing Replacement Lives for personal, family or household purposes.  The Replacement Lives qualify as a "good," or "merchandise," under various state consumer protection statutes and the Multi-State Class Members' purchases of the Replacement Lives constitute a "transaction."

87.     King, in connection with the sale of the Replacement Lives, engaged in deceptive, unconscionable, unfair, fraudulent and misleading commercial practices.

88.     King's concealed, suppressed, or omitted material facts with the intent that Plaintiff and each of the other members of the Multi-State Class rely upon such concealment, suppression or omissions.  King's objectively deceptive conduct had the capacity to deceive reasonable consumers under the circumstances.

89.     King's general course of conduct impacted the public because the acts were part of a generalized course of conduct affecting numerous consumers.

90.     King's conduct, which included deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts caused the resulting injury-in-fact and an ascertainable loss of money or property to Plaintiff and

each of the other members of the Multi-State Class. The resulting injury to Plaintiff and each of the other members of the Multi-State Class was reasonably foreseeable by King.

91.     Plaintiff, on behalf of herself and each of the other members of the Multi-State Class, seek to recover the damages suffered, including actual and punitive damages, restitution of all monies wrongfully acquired by King as a result of this misconduct, injunctive and declaratory relief, attorneys' fees, costs of suit, and other non-monetary relief as appropriate.

92.     The aforementioned practices by King violated the following state consumer protection laws:

| | |
|---|---|
| Alabama | Ala. Code §§ 8-19-1 to 8-19-15 |
| Alaska | Alaska Stat. §§ 45.50.471 to 45.50.561 |
| Arizona | Ariz. Rev. Stat. Ann. §§ 44-1521 to 44-1534 |
| Arkansas | Ark. Stat. Ann. §§ 4-88-101 to 4-88-115 |
| California | Cal. Civ. Code §§ 1750 to 1784 |
| | Cal. Bus. & Prof. Code §§ 17200 to 17209 |
| Colorado | Col. Rev. Stat. §§ 6-1-101 to 6-1-1001 |
| Connecticut | Conn. Gen. Stat. §§ 42-110a to 42-110q |
| Delaware | Del. Code. Ann. tit. 6, §§ 2501 to 2598 |
| District of Columbia | D.C. Code Ann. §§ 28-3901 to 28-3909 |
| Florida | Fla. Stat. Ann. §§ 501.201 to 501.976 |
| Georgia | Ga. Code Ann. §§ 10-1-370 to 10-1-438 |
| Hawaii | Hawaii Rev. Stat. §§ 481A to 481X |
| Idaho | Idaho Code §§ 48-601 to 48-619 |
| Illinois | Ill. Rev. Stat. ch. 815, §§ 505 to 601 |
| Indiana | Ind. Code Ann. §§ 24-5-0.5 to 24-5-25 |
| Iowa | Iowa Code Ann. §§ 714.16 to 7.14.26, 714A, B, D |
| Kansas | Kan. Stat. Ann. §§ 50-623 to 50-6107 |
| Kentucky | Ky. Rev. Stat. §§ 367.110 to 367.993 |
| Louisiana | La. Rev. Stat. Ann. §§ 51:1401 to 51:1425 |
| Maine | Me. Rev. Stat. Ann. tit. 5, §§ 205A to 214 |
| | Me. Rev. Stat. Ann. tit. 10, §§ 1211 to 1216 |
| Maryland | Md. Com. Law Code Ann. §§ 13-101 to 13-501 |
| Massachusetts | Mass. Gen. Laws Ann. ch 93A §§ 1 to 11 |
| Michigan | Mich. Comp. Laws §§ 445.901 to 445.922 |
| Minnesota | Minn. Stat. Ann. §§ 325D.09 to 325D.16 |
| | Minn. Stat. Ann. §§ 325D.43 to 325D.48 |

| | |
|---|---|
| | Minn. Stat. Ann. §§ 325F.67 to 325F.99, 325G |
| Mississippi | Miss. Code. Ann. §§ 75-24-1 to 75-24-175 |
| Missouri | Mo. Rev. Stat. §§ 407.010 to 407.1355 |
| Montana | Mont. Code. Ann. §§ 30-14-101 to 30-14-143 |
| Nebraska | Neb. Rev. Stat. §§ 59-1601 to 59-1623 |
| | Neb. Rev. Stat. §§ 87-301 to 87-306 |
| Nevada | Nev. Rev. Stat. §§ 598.0903 to 598A |
| New Hampshire | N.H. Rev. Stat. Ann. §§ 358-A:1 to 358-A:13 |
| New Jersey | N.J. Stat. Ann. §§ 56:8-1 to 56:8-184 |
| New Mexico | N.M. Stat. Ann. §§ 57-12-1 to 57-12-26, 12B |
| New York | N.Y. Gen. Bus. Law §§ 349 to 350-f-1 |
| North Carolina | N.C. Gen. Stat. §§ 75-1 to 75-115 |
| North Dakota | N.D. Cent. Stat. §§ 51-15-01 to 51-15-11 |
| Ohio | Ohio Rev. Code Ann. §§ 1345.01 to 1345.99 |
| | Ohio Rev. Code Ann. 4165.01 to 4165.04 |
| Oklahoma | Okla. Stat. Ann. tit. 15, §§ 751 to 799 |
| | Okla. Stat. Ann. tit. 78, §§ 51 to 55 |
| Oregon | Or. Rev. Stat. §§ 646.605 to 646.656 |
| Pennsylvania | Pa. Stat. Ann. tit. 73, §§ 201-1 to 210-6 |
| Rhode Island | R.I. Gen. Laws §§ 6-13.1-1 to 6-13.1-28 |
| South Carolina | S.C. Code §§ 39-5-10 to 39-5-170 |
| South Dakota | S.D. Codified Laws Ann. §§ 37-24-1 to 37-24-48 |
| Tennessee | Tenn. Code Ann. §§ 47-18-101 to 47-18-5304 |
| Texas | Tex. Bus. & Com. Code Ann. §§ 17.01 to 17.904 |
| Utah | Utah Code Ann. §§ 13-11-1 to 13-11-23 |
| Vermont | Vt. Stat. Ann. tit. 9, §§ 2451 to 2480n |
| Virginia | Va. Code §§ 59.1-196 to 59.1-207 |
| Washington | Wash. Rev. Code §§ 19.86.010 to 19.86.920 |
| West Virginia | W. Va. Code §§ 46A-6-101 to 46A-6-110 |
| | W. Va. Code §§ 46A-7-101 to 46A-7-115 |
| Wisconsin | Wis. Stat. §§ 100.01 to 100.55 |
| Wyoming | Wyo. Stat. §§ 40-12-101 to 40-12-509 |

## COUNT III
### Breach of Implied Contract
### (On Behalf of the National Class)

93.     The allegations of paragraphs 1-70 are incorporated by reference and re-alleged as

though fully set forth herein. To the extent the allegations of this Count are inconsistent with any

other allegations contained herein they are pled in the alternative.

94.     When Plaintiff and other members of National Class used the Facebook Option to received Donated Lives, they entered into a contract with King, wherein Plaintiff and members of National Class agreed to play Candy Crush; connect their Game account to Facebook; and ask their Facebook friends for Donated Lives, thereby marketing the Game.

95.     In exchange, King agreed that Plaintiff and the other National Class members would be able to receive and retain Donated Lives until Plaintiff and the other National Class members used them.

96.     By removing the Donated Lives from the Game accounts of Plaintiff and the other National Class members without their knowledge or consent, King breached this contract.

97.     As a result of King's conduct, Plaintiff and the other National Class members suffered injuries and were damaged measured by the: (1) lost value of the Donated Lives; and (2) cost of the Replacement Lives.

**COUNT IV**
**Unjust Enrichment**
**(In the Alternative to Count III)**
**(On Behalf of the National Class)**

98.     The allegations of paragraphs 1-70 are incorporated by reference and re-alleged as though fully set forth herein. To the extent the allegations of this Count are inconsistent with any other allegations contained herein they are pled in the alternative.

99.     King improperly removed Donated Lives from Plaintiff's and the other National Class members' Game accounts.

100.    King profited from this improper conduct because Plaintiff and the other National Class members bought Replacement Lives to make up for the Donated Lives that King removed.

101.    On information and belief, King profited millions—if not hundreds of millions—of dollars from people buying the Replacement Lives.

102.     Furthermore, King obtained the benefit of Plaintiff and the other National Class members marketing Candy Crush while thinking they would be able to receive and retain all Donated Lives.

103.     Retention of this benefit is inequitable, and Plaintiff and the other National Class member should be compensated by an ascertainable value to be proven at trial based on the retention of the benefit.

104.     This unjust enrichment has been to the detriment of Plaintiff and other members of National Class.

105.     Plaintiff and other members of National Class have suffered injuries in fact, including loss of money and costs incurred as a result of the King's removal of the Donated Lives.

106.     Accordingly, Plaintiff and the other National Class members are entitled to monetary damages, injunctive relief, and other relief this Court deems equitable.

<u>**COUNT V**</u>
**Violation of Illinois' Consumer Fraud**
**and Deceptive Business Practices Act**
**(On Behalf of the Illinois Subclass)**

107.     The allegations of paragraphs 1-70 are incorporated by reference and re-alleged as though fully set forth herein.

108.     The ICFA provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

109.    By offering players the Facebook Option, King represented to Plaintiff and the Illinois Subclass members that they would be able to receive and retain Donated Lives for later use.

110.    However, King misrepresented or failed to disclose that King would remove Donated Lives from the Game accounts of Plaintiff and the Illinois Subclass members.

111.     Thus, King lulled Plaintiff and the Illinois Subclass members into a false sense of security about the number of Donated Lives Plaintiff and the Illinois Subclass members had.

112.    Furthermore, King used the Facebook Option to market the Game to Plaintiff's and the Illinois Subclass members' Facebook friends, knowing that Plaintiff and the Illinois Subclass members would not be able to receive and retain all of the Donated Lives sent by their Facebook friends.

113.    In addition, King knew that due to the addictive nature of the Game, Plaintiff and the Illinois Subclass members would be inclined to purchase Replacement Lives to cover the loss of their Donated Lives.

114.    King's conduct constitutes deceptive and unfair practices under the ICFA.

115.    King intended for Plaintiff and the Illinois Subclass members to rely on these deceptions and unfair practices when Plaintiff and the Illinois Subclass members used the Facebook Option to receive Donated Lives.

116.    Plaintiff and the Illinois Subclass members have suffered injuries in fact and actual damages, including: (1) the lost value of the Donated Lives; and (2) the cost of purchasing Replacements Lives.

117.    These injuries and damages are a result of King's violation of the ICFA.

118.    These deceptive or unfair practices took place in the course of trade and commerce when Plaintiff and the Illinois Subclass members downloaded and marketed Candy Crush and when they made In-App Purchases, such as Replacement Lives.

119.    Plaintiff's and the Illinois Subclass members' injuries were proximately caused by King's unfair and deceptive behavior, which was conducted with reckless indifference toward the rights of others, such that an award of punitive damages is appropriate.

120.    As a result, Plaintiff and the Illinois Subclass are entitled to monetary damages, injunctive relief, and other relief this Court deems equitable.

## VIII.   JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## IX.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff Alina Renert individually and on behalf of the Classes, requests that the Court enter an Order as follows:

A.    Certifying the Classes as defined above, appointing Plaintiff Alina Renert as the representative of the Class, and appointing her counsel as Class Counsel;

B.    Awarding of actual damages, and punitive damages, as allowable by law, to Plaintiff and the other members of the Classes;

C.    Enjoining Defendants from removing Donated Lives from the Game accounts of Plaintiff and the other members of the Classes;

D.    Awarding of reasonable attorneys' fees and costs; and

E.    Awarding such other and further relief that the Court deems reasonable and just.

Date: March 2, 2015

Respectfully submitted,

ALINA RENERT, individually and on behalf of all others similarly situated,

By:  *s/ Joseph J. Siprut*
          One of the Attorneys for Plaintiff
          And the Proposed Putative Classes

Joseph J. Siprut
*jsiprut@siprut.com*
Michael L. Silverman
*msilverman@siprut.com*
Ismael T. Salam
*isalam@siprut.com*
SIPRUT PC
17 N. State Street
Suite 1600
Chicago, Illinois 60602
312.236.0000
Fax: 312.241.1260

4823-5878-3768, v. 5