**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ZACHERY LISTON, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15 CV 01853 |
| KING.COM, LTD., | ) ) | Judge John J. Tharp, Jr. |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Zachery Liston brings this proposed class action against defendant King.com, Ltd., the operator of the popular mobile game Candy Crush Saga, alleging that King improperly and unilaterally removed so-called Donated Lives from Liston's and other players' game accounts. King has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of standing, and under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons stated below, the defendant's motion to dismiss [31] is granted in part and denied in part.

## BACKGROUND

In deciding a motion to dismiss under Rule 12(b)(1) or Rule 12(b)(6), the Court takes as true all well-pleaded facts alleged in the complaint and draws reasonable inferences in the plaintiff's favor. *Lee v. City of Chi.*, 330 F.3d 456, 468 (7th Cir. 2003) (Rule 12(b)(1); *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2012) (Rule 12(b)(6)). The following facts are, therefore, accepted as true for the purposes of deciding this motion.

Candy Crush, played on mobile devices including iPhones, iPads, and Androids, is essentially a match-making puzzle game in which players aim to line up three or more of the

same icon in various configurations so as to clear them from the board and earn points. First Am. Compl. ¶¶ 30-34, ECF No. 15. Players advance to subsequent levels of the game as they clear the requisite number of icons from the board, and have only a limited number of turns, or moves, they may take to try to clear those icons. *Id.* ¶ 34. If a player fails to remove the requisite icons within a certain number of moves, they lose one of their in-game "lives"—chances to line up the requisite number of icons—and have to repeat that level. *Id.* ¶ 35.

Candy Crush players start the game with five lives, and also gain an additional free life every thirty minutes, up to a limit of five (the "Free Life Option"). *Id.* ¶¶ 37-38. Players using this method for obtaining additional lives have to wait thirty minutes to resume the game once they have lost all of their lives. *Id.* ¶ 38. Because the game is "addictive," as described by news outlets, players often do not want to wait thirty minutes for additional lives, and instead can rely on the two other avenues that King has provided for obtaining more lives. *Id.* ¶¶ 39-40. The first method is for players to buy additional lives while they are in the game through so-called In-App purchases (the "Purchase Option"). *Id.* ¶ 42. A player can buy five additional lives for $.99. *Id.* ¶ 3. The second method is for players to link their Candy Crush accounts to their Facebook accounts, which then enables them to request and receive more lives (which the plaintiff refers to as "Donated Lives") from their friends on Facebook who also have Candy Crush installed on their mobile devices (the "Facebook Option"). *Id.* ¶¶ 43-46. If a player's Facebook friends have not yet installed Candy Crush, they are prompted to do so, meaning that the Facebook Option allows King to receive a benefit from players marketing Candy Crush to their friends, according to Liston. *Id.* ¶ 45. This option thus enables King to pass on marketing costs to consumers. *Id.* Under either the Purchase Option or the Facebook Option, "lives have an economic and ascertainable value equal to approximately $0.20." *Id.* ¶ 47.

Candy Crush has enjoyed enormous popularity among mobile gamers, bringing in an average of 93 million daily active users in December 2013 and grossing an estimated $1.9 billion in revenue that year. *Id.* ¶¶ 3, 28. Overall, the game has counted roughly 250 million people as players. *Id.* ¶ 9. Plaintiff Zachery Liston began playing Candy Crush on his iPhone in early 2012, and connected his Candy Crush account to his Facebook account around that same time. *Id.* at ¶¶ 49-50. When he ran out of lives, Liston used the Facebook Option, "periodically asking his Facebook friends for Donated Lives." *Id.* ¶ 51. Some of those Facebook friends installed Candy Crush because of that request, and Liston received his Donated Lives and exited the game. *Id.* ¶¶ 52-53. When he returned to the game, however, he discovered that the Donated Lives had disappeared; other Candy Crush players reported the same problem on various online message boards.[1] *Id.* ¶¶ 54, 56-57. King had allegedly designed or changed Candy Crush in order to remove the Donated Lives, and did not inform players beforehand. *Id.* ¶ 58.

Based on these vanishing Donated Lives, Liston, an Illinois citizen, brings this proposed class action against the game's operator, King.com, Ltd. ("King"). Liston filed the first amended complaint in this case on March 27, 2015, asserting claims for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 (Count I), breach of implied contract (Count III), and unjust enrichment (Count IV) as an alternative to the breach of implied contract claim, seeking to represent himself and a national class of all individuals in the United Sates whose Donated Lives were removed from their Candy Crush accounts by King. *Id.* at 11-22. Liston also brings a claim for violation of the consumer protection statutes of all 50 states and the District of Columbia (Count II), and seeks to represent a multi-state class of all individuals in those states whose Donated Lives were similarly removed. *Id.* He brings a separate count for violation of

---

[1] The complaint does not allege that Purchased Lives also disappeared.

Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.*, (Count V), on which he seeks to represent an Illinois subclass of all individuals residing in Illinois who experienced the same removal of their Donated Lives. *Id.* King has moved to dismiss Liston's complaint under Rule 12(b)(1) for lack of Article III standing, and under Rule 12(b)(6) for failure to state a claim.

## ANALYSIS

### I. Jurisdiction

Liston asserted both federal question and diversity jurisdiction in his complaint, but he has voluntarily withdrawn his claim under the CFAA, *see* Pl.'s Resp. at 2 n.1, ECF No. 41, which was the only federal claim he alleged and thus his only basis for federal question jurisdiction. He alleges diversity jurisdiction, meanwhile, under the Class Action Fairness Act ("CAFA"). King does not dispute the existence of diversity jurisdiction, but contends that Liston lacks Article III standing to pursue the claims he has asserted, both individually and on behalf of the putative class.

#### A. Diversity Jurisdiction under CAFA

The diversity jurisdiction statute, 28 U.S.C. § 1332, ordinarily requires complete diversity of citizenship before a federal court may exercise jurisdiction on that basis. CAFA alters the complete diversity requirement, however, vesting federal courts with subject matter jurisdiction over cases in which any member of the proposed class is a citizen of a state and, as relevant here, "any defendant is a foreign state or a citizen or subject of a foreign state." 28 U.S.C. § 1332(d)(2). For CAFA diversity jurisdiction to be available, the amount in controversy must also exceed the sum or value of $5,000,000, exclusive of interest and costs, and the proposed classes must encompass at least 100 members in the aggregate. *Id.* § 1332(d)(2), (5).

CAFA's diversity criteria are satisfied here. King is organized in and has its principal place of business in the Republic of Malta. First Am. Compl.¶ 21. Liston is an Illinois citizen. *Id.* ¶ 17. Liston's complaint satisfies CAFA's other jurisdictional requirements as well. Here, Liston alleges that Candy Crush has brought in roughly 250 million players—with an average of 93 million daily active users at one point—and that at least 25 million individuals have been injured by King's removal of the lives allegedly worth $.20 each. These allegations are sufficient to support the exercise of CAFA diversity jurisdiction given that CAFA authorizes the aggregation of class members' claims to meet the amount of controversy threshold. 28 U.S.C. § 1332(d)(6); *see also, e.g., Baldwin v. Star Scientific, Inc.*, 78 F. Supp. 3d 724, 736 (N.D. Ill. 2015) ("The court assumes that it has jurisdiction because Plaintiff's expectation (however realistic it may be) that he could litigate a nationwide class action against Defendants justified the conclusion that the class could recover economic damages in excess of CAFA's $5 million amount-in-controversy threshold."); *cf. Back Doctors Ltd. v. Metro. Prop. & Cas. Co., Inc.*, 637 F.3d 827, 830 (7th Cir. 2011) ("[T]he estimate of the dispute's stakes advanced by the proponent of federal jurisdiction controls unless a recovery that large is legally impossible."). Given Liston's allegations regarding the number of Candy Crush players overall, his claim of at least 25 million class members is not legally impossible. With a minimum alleged loss per person of just 20 cents (the alleged value of the loss of just one Donated Life), Liston's claim on behalf of the putative class provides an adequate basis for jurisdiction under CAFA.

### B.    Standing

King asserts that Liston lacks Article III standing and that the First Amended Complaint must therefore be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. Def.'s Mem. at 7, ECF No. 33. The issue of standing concerns whether Liston "is entitled to have the

court decide the merits of the dispute or particular issues." *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citations and quotations omitted). It is the plaintiff's burden to show that he meets the requirements of standing. *See Kathrein v. City of Evanston*, 636 F.3d 906, 914 (7th Cir. 2011) (citation omitted). To establish Article III standing, Liston must show "an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and 'that is likely to be redressed by a favorable judicial decision.'" *Bank of Am. Corp. v. City of Miami*, —— U.S. ——, ——, 137 S. Ct. 1296, 1302 (2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. ——, ——, 136 S. Ct. 1540, 1547 (2016)). To establish an injury in fact, Liston must allege that he "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo,* 136 S. Ct. at 1548 (citation and quotation marks omitted). An injury must "actually exist," but does not need to be tangible, to satisfy the concreteness requirement. *Id.* But a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 1549.

King argues that Liston has not alleged an injury-in-fact because he played Candy Crush for free, received the additional Donated Lives for free, and never purchased anything from King. Def.'s Mem. at 4-5. King analogizes this scenario to data breach cases in which plaintiffs' personally identifiable information ("PII") is accessed, but never actually used improperly, in a breach. *Id.* at 5. Data breach plaintiffs have alleged that they lost the monetary value of their PII when that information was stolen and potentially sold, but King points to cases that found those plaintiffs lacked standing. Some courts have held that PII does not have "an inherent monetary value for which plaintiffs can expect compensation," King notes. *Id.* at 5. King also draws parallels to other decisions that have reasoned that even if PII did have such a value, plaintiffs

cannot allege an injury-in-fact unless they would have sold their PII but for its theft. *Id.* at 6. King argues that Liston has not alleged that he would have sold his Donated Lives, or that a market even existed in which he could have sold those lives. *Id.* at 6. Separately, King argues that Liston lacks Article III standing for his non-Illinois state claims in Count II because he does not live in, nor allege he was injured in, those states. *Id.* at 7.

In response, Liston maintains that he has adequately alleged that he suffered injuries-in-fact because he asserts that he was deprived of lives he had earned in Candy Crush and was not otherwise compensated for his "social marketing of King's product." Pl.'s Resp. at 3. Liston asserts that both he and King believed that the lives and those marketing services had value, as shown by the fact that they had agreed to exchange them, and further argues that the Donated Lives have an ascertainable value of $.20 per life because that is the cost of lives that players could otherwise acquire using the Purchase Option. *Id.* at 4. Liston argues that Donated Lives are more valuable than the free lives a Candy Crush player can receive by waiting for thirty minutes to pass because the Donated Lives acquired through the Facebook Option can be used immediately or stored for future use (though Liston alleges in this case, of course, that King removed the lives rather than leaving them in storage). *Id.* Liston asserts that this is "a valuable difference to players, whose addiction to Candy Crush drives King's entire enterprise," and further argues that when King deleted the Donated Lives from his account, he lost the economic benefit he had derived from his exchange with King. *Id.* at 4-5. Liston rejects King's analogy to PII theft, arguing that such cases do not involve any contractual exchange and that even after a theft of PII, people still retain and may use their PII, whereas Liston has lost all access to the deleted lives. *Id.* at 7. Finally, Liston argues that any standing challenge to his multi-state claims is premature, and that while there is a split in this District over whether a court should address

the standing issue on multi-state claims before the class certification stage, this Court should side with the judges who have deferred the question until after resolving a class certification motion. *Id.* at 8.

King's injury-in-fact argument misses the mark. The game operator focuses on Liston's alleged failure to assert an immediate economic loss, but an injury need not be economic in nature to support Article III standing. *See, e.g.*, *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686 (1973) ("In interpreting 'injury in fact' we made it clear that standing was not confined to those who could show 'economic harm' . . . ."). The Supreme Court recently noted in *Spokeo*, for example, that "the law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure," and that the Supreme Court has previously recognized Article III standing based on alleged deprivations of rights such as free speech and free exercise. *Spokeo*, 136 S. Ct. at 1549. The Seventh Circuit has similarly noted that "[i]njury-in-fact for standing purposes is not the same thing as the ultimate measure of recovery. The fact that a plaintiff may have difficulty proving damages does not mean that he cannot have been harmed." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 808 (7th Cir. 2013).

Further, even were immediate economic injury a requirement of standing, King's analogy to data breach cases to demonstrate Liston's lack of standing would be unpersuasive. First, even in the context of PII theft, the premise that PII has no inherent economic value is debatable. It is true, as King argues, that some courts hearing data breach or data privacy cases have suggested that PII lacks a monetary value for which plaintiffs could be compensated. *See, e.g., Willingham v. Global Payments, Inc.*, No. 1:12–CV–01157, 2013 WL 440702, *7 (N.D. Ga. Feb. 5, 2013) (PII "does not have an inherent monetary value"); *In re Jetblue Airways Corp. Privacy Litig.*,

379 F. Supp. 2d 299, 327 (E.D. N.Y. 2005) (dismissing a breach of contract claim because plaintiffs "had no reason to expect that they would be compensated for the 'value' of their personal information"). But several of the cases King cites have since been reversed or partly vacated on appeal. *See In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 134, 149 (3d Cir. 2015) (finding plaintiffs did have Article III standing, but had failed to state a claim under the CFAA where they plausibly alleged a market for the internet history data the defendants had compiled but had not alleged any facts showing that they intended to participate in that market or that the defendants had prevented them from recovering that information's full value), *cert. denied*, 137 S. Ct. 36 (2016); *Galaria v. Nationwide Mutual Ins. Co.*, 663 Fed. App'x 384, 388-89 (6th Cir. Sept. 12, 2016) (finding plaintiffs did have Article III standing where they alleged that the theft of their personal data put them at an increased and continuing risk of fraud and that they had expended costs to mitigate that risk). The Seventh Circuit has also recently found Article III standing to be present in cases where the plaintiffs plausibly alleged a substantial risk of identity theft and fraudulent credit card charges in the future and further alleged that they had already spent time and money to mitigate that risk. *See Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693-94 (7th Cir. 2015); *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966-68 (7th Cir. 2016).

Regardless, the analogy also fails because it is inapt; the factual circumstances of the PII cases on which King relies are simply not analogous to the facts Liston sets out in his complaint. The complaint alleges, plausibly enough, that Candy Crush lives have actual economic value; they are available for purchase at a particular price and King compensates players for marketing the game by facilitating the receipt of Donated Lives. King's argument that an asset that it is able to sell for 20 cents has no inherent value is untenable; that the game provides a mechanism by

which players may also receive such assets for free in exchange for activities that King values does not change that basic fact. The complaint alleges that there is a market price for additional lives, and that claim is corroborated by the fact that King itself sells additional lives in the open market. Accepting that allegation as true for purposes of this motion, as required, Liston plainly has standing to complain of the loss of those assets by means of King's conduct—whether that conduct is labeled as fraud, theft, conversion, or is described by some other legal theory. Liston's complaint does not require a determination of whether some future risk is a sufficiently concrete and particularized injury to support Article III standing—as was the issue in several of the above-cited data breach cases—but instead alleges a harm that has already occurred: the removal of Donated Lives from his game account. At this stage of the litigation, Liston has sufficiently alleged an injury in fact to satisfy Article III's standing requirements and defeat King's Rule 12(b)(1) as to the majority of his claims.[2]

---

[2] After the parties had completed briefing on the motion to dismiss, King cited as supplemental authority an order granting a motion to dismiss in *Mason v. Machine Zone, Inc.*, 140 F. Supp. 3d 457 (D. Md. 2015), as well as the Fourth Circuit's decision affirming the dismissal of the only claim the plaintiff appealed, *Mason v. Machine Zone, Inc.*, 851 F.3d 315 (4th Cir. 2017) (hereinafter *Mason Appeal*). In *Mason*, a Maryland district court granted a Rule 12(b)(6) motion to dismiss a case in which an individual alleged that a free-to-play mobile video game violated various state consumer laws. *Mason,* 140 F. Supp. 3d at 459. The game included an option for players to purchase, using real-world money, digital "gold," which they could then choose to spend in the game's virtual Casino. *Id.* at 460. The Casino offered a chance to bet on a spinning wheel, which in turn could produce a virtual prize. *Id.* Under the theory that was the subject of her appeal, the plaintiff alleged that the Casino was an unlawful gaming device under Maryland's gambling loss recovery statute and that she suffered damages when she lost more than $100 betting in the game's Casino. *Mason Appeal*, 851 F.3d at 318. In granting the motion to dismiss, that district court had considered it crucial that "there is no real-dollar value attached" to the virtual gold in the game. *Mason*, 140 F. Supp. 3d at 460. The Fourth Circuit affirmed, noting that the virtual chips she had "purchased" with digital "gold"—which she previously paid for with real-world funds—were "not redeemable for money," and that as a result, there "was no money at stake" when she spun the Casino wheel. *Mason Appeal*, 851 F.3d at 319. The Fourth Circuit found that, based on how the game operated, the plaintiff "could not have lost or won money as a result of her participation in that virtual activity." *Id.*

As an initial matter, *Mason* was not a standing case (at least the issue of standing was not

King's argument that Liston lacks standing to bring claims under the laws of states where he does not allege he resides or was injured is more complicated, as it presents the conceptual question of whether Liston's ability to assert such claims is a question of standing, or one of whether he is an appropriate representative of the putative class, or both. King contends that because Liston claims no injuries in any state other than Illinois, he has no standing to pursue statutory causes of action under the laws of any other state; accordingly, King submits that Liston's claims under any state laws other than those of Illinois must be dismissed. Liston argues that King's standing challenge to these claims is premature, and that this Court should defer consideration of the issue until this case reaches the class certification stage. In support of his argument, Liston points to the Supreme Court's recognition of the class action as "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Pl.'s Resp. at 9 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)).

Liston is correct that the Supreme Court has indicated that where class certification issues are dispositive and the resolution of those issues is "logically antecedent to the existence of any Article III issues," a court may resolve the class certification issues first. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612 (1997); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (finding class certification issues should be addressed first where they were logically antecedent to Article III issues and "themselves pertain[e]d to statutory standing, which may

_____

raised in this context); the district and appellate courts held that the complaint failed to state a cause of action, not that the plaintiff lacked standing. In any event, the case is also completely distinguishable. There, the plaintiff complained that she received nothing of value for the digital gold she purchased, but she got exactly what she bargained for, namely the right to access additional resources to play the game. Here, Liston's complaint is that King took assets he had effectively paid for by providing marketing services. *Mason* would only be analogous if, having purchased $100 in digital gold, the game operator had removed the digital gold from Mason's account altogether. Nothing in *Mason* suggests that a conversion of funds in that manner would not constitute a "real world" economic injury.

properly be treated before Article III standing"). Both *Amchem* and *Ortiz* concerned certification of settlement classes in asbestos litigation, and in both cases the Supreme Court reached its decisions based on class certification issues and so did not go on to squarely address the standing issues that objectors to the settlements had also raised. *Amchem*, 521 U.S. at 628-29; *Ortiz*, 527 U.S. at 864-65. And the Seventh Circuit relied on *Ortiz* in *Payton v. County of Kane*, 308 F.3d 673, 675 (7th Cir. 2002), where six former arrestees had brought a proposed class action against Illinois' DuPage and Kane counties—the counties that charged the named plaintiffs the bond fees at issue in the case—as well as 17 additional counties that had not charged any of the named plaintiffs the contested bond fee. *Id.* The counties all imposed the alleged bond fees pursuant to a single state statute, and the appellate court found that it was "reasonable for the putative plaintiff class to try to hold all counties accountable within one suit" and that "[t]he constitutionality of a bond fee . . . should not differ from one county to the next, when such a fee is imposed pursuant to the same statute." *Id.* at 680. The Seventh Circuit understood *Ortiz* "to rest on the long-standing rule that, once a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Id.* Accordingly, the court held that before the district court could decide whether the suit could proceed against the other 17 counties the plaintiffs had named, it had to resolve the question of class certification. *Id*.

*Payton*, however, is distinguishable from this case in a significant way: there, the named plaintiffs sought to represent a class against counties which had all acted pursuant to a common state statute. Liston, in contrast, is seeking to represent a class on claims he brings not just under the consumer protection statute of Illinois, but under the consumer protection statutes of the 49 other states as well as the District of Columbia, without any allegation that he lived or was

injured in those states. Courts in this District that have considered the situation Liston's case now presents have split on whether consideration of standing issues may be postponed until after class certification in such circumstances. *See Baldwin,* 78 F. Supp. 3d at 733-35 (discussing split and collecting cases). Some have taken *Amchem* and *Ortiz* to create an exception to the default rule that standing is to be considered as a threshold matter, and applied that exception in such cases. *See, e.g.*, *Bietsch v. Sergeant's Pet Care Prods., Inc.*, No. 15 C 5432, 2016 WL 1011512, at *9 (N.D. Ill. Mar. 15, 2016) (deferring the standing issue until the class certification stage and agreeing with district court cases that have reached a similar conclusion); *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3754041, at *5 (N.D. Ill. Nov. 5, 2009) (denying motion to dismiss antitrust and consumer protection claims brought under the statutes of states in which named plaintiffs did not live or allege injury, finding that the "name plaintiffs' capacity to represent individuals from other states depends upon obtaining class certification, and the standing issue would not exist but for their assertion of state law claims on behalf of class members in those states.").

Other courts in this District have interpreted *Ortiz* and *Amchem* more narrowly. *See, e.g.*, *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CV 3690, 2013 WL 4506000, at * 6 (N.D. Ill. Aug. 23, 2013) (declining to delay consideration of standing issues); *Tillman v. U.S. Energy Sav. Corp.*, No. 08 C 1641, 2008 WL 2754813, at *2 (N.D. Ill. July 14, 2008) (after declining to defer the standing issue, finding the named plaintiff lacked standing because she could never represent a class of Illinois citizens in connection with claims under the Illinois Consumer Fraud Act, as she was an Indiana citizen and the transaction at issue occurred in Indiana); *see also In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 923 (N.D. Ill. 2009), *vacated and remanded on other grounds sub. nom.*, *Minn–Chem, Inc. v. Agrium Inc.*, 657 F.3d

650 (7th Cir. 2011) (dismissing antitrust and unfair competition claims brought under the laws of states where no named plaintiff resided or allegedly suffered an injury, and finding that *Ortiz* "does not compel a district court to delay reviewing Article III standing issues until after class certification" but instead requires an "appellate court simultaneously facing both class certification and Article III standing issues [to] deal with Rule 23 issues first when they are dispositive").

If this really is a standing question, this Court agrees that any exception created by *Ortiz* and *Amchem* does not apply to cases like the one Liston presents here. Rather, *Ortiz* requires "a court simultaneously facing both class certification and Article III standing to deal with Rule 23 issues first when they are dispositive, but [does] not direct[] district courts to postpone an inquiry into the threshold issue of justiciability outside of that context." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2013 WL 4506000, at *6. That the Seventh Circuit has addressed Article III standing prior to class certification post-*Ortiz* confirms that *Ortiz* does not require a ruling on class certification before standing. *See, e.g., Meyers v. Nicolet Restaurant of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016) (finding that the plaintiff lacked standing, such that the Seventh Circuit need not reach the question of class certification); *Arreola v. Godinez,* 546 F.3d 788, 794–95 (7th Cir. 2008) (deciding individual standing to pursue injunctive relief prior to evaluating class certification issues). The plaintiff has not yet affirmatively sought the certification of a class,[3] so here there is no logically antecedent certification matter to address.

Conceptually, however, this Court questions whether Liston's claims under state consumer protection statutes present a question of constitutional standing at all. Liston claims

---

[3] The plaintiff filed a class certification motion at the outset of the case, *see* Am. Mot. for Class Certification, ECF No. 16, but that was done for purely prophylactic purposes. This Court denied the motion without prejudice to its reassertion at whatever point the plaintiff was prepared to brief his motion. *See* ECF No. 51.

injury based on King's conduct; if he suffered a concrete and particularized injury, he has constitutional standing to pursue his claim. As discussed above, Liston has adequately alleged that he has standing. The question of what legal theories Liston may advance as bases for recovering damages for his injury does not implicate Article III standing; the availability of any particular legal theory presents a question of substantive law. The Supreme Court has observed that "a statute ordinarily provides a cause of action 'only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.'" *Bank of Am. Corp.*, 2017 WL 1540509, at *6 (quoting *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014). This zone-of-interests inquiry requires courts to determine, "'using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.'" *Id.* (quoting *Lexmark*, 134 S. Ct. at 11). Liston's allegations in Count II also call to mind the "general prohibition on a litigant's raising another person's legal rights," a concept that courts have historically categorized as a principle of prudential standing. *See Lexmark*, 134 S. Ct. at 1386 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)); *Bank of Am. Corp.*, 2017 WL 1540509, at *6 (concluding that the plaintiff's claims "satisfy the 'cause-of-action' (or 'prudential standing') requirement"); *but see Lexmark*, 134 S. Ct. at 1387 n.4 (stating that "prudential" and "statutory" are both misleading labels for this cause-of-action inquiry).

It is true, as Liston notes, that the class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only,'" *see Wal-Mart*, 564 U.S. at 348, but qualifying for that exception depends on the ability of any named plaintiffs to satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Federal Rule of Civil Procedure 23(a). *See id.*; Fed. R. Civ. Pro. 23(a); *see also Halperin v.*

*Int'l Web Servs.*, LLC, 123 F. Supp. 3d 999, 1009 (N.D. Ill. 2015) (finding Illinois plaintiff's ability to raise claims under the consumer protection laws of other states was "more accurately characterized as an attack not on [the plaintiff's] Article III standing per se" but rather "on his ability under Rule 23 to represent the multi-state class"). Even apart from the question of whether Liston can personally sue under the law of a state where he did not reside and in which he was not injured, therefore, Rule 23 imposes additional restrictions on his ability to assert claims on behalf of people who were.

All of this implies that, although King's challenge may be mischaracterized, the concerns that have informed the views of courts holding that "standing" to pursue claims based on various state laws should be resolved up front are valid. In the words of another district court:

> The alternative proposed by the plaintiffs would allow named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union. At the conclusion of that discovery, the plaintiffs would apply for class certification, proposing to represent the claims of parties whose injuries and modes of redress they would not share. That would present the precise problem that the limitations of standing seek to avoid.

*In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 155 (E.D. Pa. 2009).

Whether one views the question of Liston's legal authority to pursue a claim under the law of a state where he did not reside and was not injured as a question of standing, or substantive law, or typicality and adequacy under Rule 23, there is plainly ample reason at this juncture to question whether Liston will be able to pursue claims based on statutory causes of action created by states where Liston neither lived nor was injured. While it is not, in this Court's view, appropriate to hold that Liston has no standing to assert his own state law consumer protection claim, it would also be inappropriate to engage in wide-ranging discovery premised on

a prospect as to which there is substantial doubt—namely, Liston's ability to assert causes of action created by other states for the benefit of other individuals injured in those other states. Accordingly, the Court anticipates that it will stay discovery on such claims until such time as the question of class certification is squarely before the Court, or some additional class representative(s) whose entitlement to pursue such claim(s) has been identified, or some other ground has been advanced to provide reasonable assurance that there will be a valid basis to pursue such discovery in this case.

**II. Failure to State a Claim**

King also argues that the complaint should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Adams*, 742 F.3d at 728 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A court must accept all of the plaintiff's factual allegations as true when reviewing the complaint, but conclusory allegations that merely restate the elements of a cause of action do not receive this presumption. *See Iqbal*, 556 U.S. at 679.

In its Rule 12(b)(6) arguments, King attacks each of Liston's counts separately. Def.'s Mem. at 6-15. As this Court has noted before, this sort of parsing disregards the difference between "claims" and "counts." "Complaints plead claims, which is to say grievances." *ACF 2006 Corp. v. Mark C. Ladendorf, Attorney at Law, P.C.*, 826 F.3d 976, 981 (7th Cir. 2016). "Counts," by contrast, typically describe different legal theories by which those facts purportedly

give rise to liability and damages. *Lucas v. Vee Pak, Inc.*, 68 F. Supp. 3d 870, 876–77 (N.D. Ill. 2014); *see also Mannes v. Ford Motor Co., Inc.*, No. 13 C 07381, 2014 WL 7332616, at *2 (N.D. Ill. Dec. 22, 2014); *Volling v. Antioch Rescue Squad,* 999 F. Supp. 2d 991, 996–97, 2013 WL 6254254, at *2 (N.D. Ill. 2013); *see generally NAACP v. Am. Family Mut. Ins. Co.,* 978 F.2d 287, 292 (7th Cir. 1992). Pleading in counts, although often helpful and permitted by Rule 10(b), is not required; as noted already, it is axiomatic that a plaintiff is not required to plead legal theories at all. *See Jajeh v. Cnty. of Cook,* 678 F.3d 560, 567 (7th Cir. 2012) (hostile work environment claim pleaded where complaint never used that term); *Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery.").

King's motion elides this distinction and its import. Regardless of whether facts sufficient to establish the viability of a particular legal theory have been pleaded, Liston's complaint survives if the facts alleged plausibly entitle him to legal relief under some theory, even if not one expressly identified in the complaint. To prevail on his motion to dismiss, King must establish that none of the legal theories Liston has advanced, or any other, plausibly establishes a right to recover damages from King for the injuries Liston (and the members of the putative class) have allegedly suffered.

To begin, King challenges Liston's right to recover under the CFAA. Rather than responding to King's substantive challenges to the CFAA claim, Liston seeks leave to withdraw that "claim" without prejudice. Pl.'s Resp. at 2 n.2. King seeks dismissal of the CFAA claim with prejudice, *see* Def.'s Reply, ECF No. 44, at 6, but that would not be appropriate at this juncture because the CFAA count is not a legal "claim," but a legal cause of action—a legal theory as to why Liston is entitled to recover from King based on his legal claim that King's

conduct injured him. Multiple legal theories in support of a claim differ from multiple claims that must be separately pleaded; "complaints need not cite authority or set out a line of legal argument." *ACF 2006 Corp.*, 826 F.3d at 981. Liston did not need to plead entitlement to recovery under the CFAA to begin with, so he is not now barred from withdrawing that assertion at this preliminary juncture. Further, Liston has the right, pursuant to Federal Rule of Civil Procedure 41(a)(1)(a)(i) to unilaterally dismiss without prejudice this entire action, as the defendants have not filed an answer or motion for summary judgment, so permanently revoking his right to assert a particular legal theory would substantially undermine that right.

Apart from his "standing" challenge, King has also moved to dismiss the claims under state consumer law under Rule 12(b)(6), asserting that Liston has pleaded those claims "without identifying the statutory sections allegedly violated or providing factual allegations supporting each element of each claim." Mem. at 18. This argument, like the standing challenge, is premature. Because a complaint is not required to set forth all (or any) of the legal theories on which recovery may ultimately be asserted, it remains to be seen whether Liston and the putative class will actually move forward on all, or any, of the non-Illinois causes of action. Accordingly, the Court will not evaluate the legal sufficiency of those theories unless and until there is a class representative who may properly assert them.

As to Count III, King argues that Liston has "failed to state a claim" for breach of an implied-in-fact contract because he has "not identified a promise by King that he could retain Donated Lives indefinitely in exchange for soliciting Donated Lives," and has further failed to allege that King intended to be bound by any such promise. Def.'s Mem. at 19. It is not clear to this Court, based on the allegations in the First Amended Complaint, that a breach of contract

theory is available here. Liston has not pled many facts to suggest that a contract existed,[4] and instead simply alleges in Count III that when he and the proposed class members used the Facebook Option to obtain Donated Lives, they "entered into a contract with King, wherein Plaintiff and members of a National Class agreed to play Candy Crush; connect their Game account to Facebook; and ask their Facebook friends for Donated Lives, thereby marketing the game." First Am. Compl. at 20. Liston asserts that "[i]n exchange, King agreed that Plaintiff and the other National Class members would be able to receive and retain Donated Lives" until they used them. *Id.* The Donated Lives apparently flowed from Liston's Facebook friends to Liston, not from King to Liston, and Liston provides no factual allegations regarding how King communicated this agreement to him, or even how he learned about the Facebook Option. So, perhaps, the assertion of a breach of contract theory will fail.

No matter. Again, Liston is not required to plead a legal theory at this stage of the litigation. *See, e.g., Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011) ("A complaint need not identify legal theories, and specifying an incorrect theory is not a fatal

---

[4] King filed a separate request for judicial notice in support of its motion to dismiss, asking this Court to take judicial notice of King's license agreement, which was last updated on February 10, 2015, and which King said is "applicable to players who access King's Candy Crush Saga game via their mobile devices" and is "publicly available online." Req. for Judicial Notice, ECF No. 34, at 1. King argues in its memorandum in support of its motion to dismiss that the Candy Crush Terms of Service "advise players that in-game lives have no financial value and can be removed by King at any time." Def.'s Mem. at 5 n.4. Liston opposes the request to take judicial notice. Pl.'s Resp. to Judicial Notice, ECF No. 42. Federal Rule of Evidence 201 does state that a court "may judicially notice a fact that is not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. Pro. 201(b)(2). The same rule states that a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Rule 201(c)(2). Here, however, there is a critical problem: the license agreement King presents was last updated in 2015, while Liston asserts that King began removing Donated Lives at some point in 2012. Because King has failed to demonstrate that the submitted version of the license agreement was in place and applied to Liston at the relevant time period—the only apparent relevance it could have at this juncture—the request for judicial notice [34] is denied.

error."); *Jogi v. Voges*, 480 F.3d 822, 826 (7th Cir. 2007) ("It is established . . . that complaints need not plead legal theories.). As discussed above, Liston has plausibly alleged that lives in Candy Crush—whether donated or otherwise acquired—have some monetary value. Liston alleges that King plucked those lives out of his account, without ever indicating that the lives were valid only for a limited time. The facts alleged in Count III therefore give rise to a plausible legal claim, whether under a theory of breach of contract, theft, conversion, fraud, or something else. Liston's complaint is sufficient to put King on notice of the essential nature of his claim: King injured Liston by preventing him from using an asset in which he had a property interest. The precise legal theory, or theories, on which such a claim may be premised, will be determined not at this stage, but during discovery, in advance of summary judgment and/or trial. Accordingly, the motion to dismiss is denied as to Count III.

For the same reasons, the Court declines to dismiss the unjust enrichment claim in Count IV. "To prevail on a claim for unjust enrichment, a plaintiff must prove that the defendant 'retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience.'" *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1043 (Ill. App. Ct. 2015) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672 (1989)).[5] Here, Liston alleges that King retained a benefit when Liston marketed Candy Crush to his friends, and that this was to Liston's detriment in that King removed—without warning—the Donated Lives that Liston had

---

[5] King argues that an unjust enrichment claim also requires that the defendant have had an independent duty to act, but for this point cites only to *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 1025 (Ill. App. Ct. 2009). Yet a more recent Illinois Appellate Court decision from 2015 disagreed with the notion that alleging such a duty is required, saying that "*Martis* is not an accurate statement of the law on the equitable claim for unjust enrichment." *DiMucci*, 34 N.E.3d at 1042. As there is no requirement at this juncture to definitively resolve questions of entitlement to relief under particular legal theories, the Court need not presently predict how the Illinois Supreme Court would resolve this question.

received in exchange for his marketing. As noted above, Liston may yet refine the legal theory or theories he pursues, but at this point his factual allegations are sufficient to defeat King's motion to dismiss Count IV.[6]

Finally, King asserts that Liston's claim for violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") in Count V must be dismissed because Liston has not alleged actual damages, does not meet the ICFA's "consumer" requirements, has failed to allege proximate cause, and has failed to plead this claim with the particularity required by Rule 9(b). Def.'s Mem. at 22-24.

The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce," 815 ILL. COMP. STAT. 505/2. To state a claim under ICFA, a plaintiff must allege "(1) a deceptive act or unfair practice occurred, (2) the defendant intended for plaintiff to rely on the deception, (3) the deception occurred in the course of conduct involving trade or commerce, (4) the plaintiff sustained actual damages, and (5) such damages were proximately caused by the defendant's deception." *Dubey v. Public Storage, Inc.*, 918 N.E.2d 265, 277 (Ill. App. Ct. 2009). The actual damage component requires that a private party plaintiff allege an "actual pecuniary loss." *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) (quoting *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1197 (Ill. App. Ct. 2008)). In Count V, Liston alleges that he and the proposed Illinois Subclass "have suffered injuries in fact and actual damages, including: (1) the lost value of the Donated Lives; and (2) the cost of purchasing Replacement Lives." First Am. Compl. ¶ 115. King argues that Liston has not alleged actual

---

[6] In view of the fact that the unjust enrichment count is pled in the alternative, and that Liston has asserted a breach of contract claim as well as a fraud claim, the dismissal of the fraud claim without prejudice (*see infra*) does not mandate dismissal of the unjust enrichment theory. *Compare Pirelli Armstrong Tire Corp., Retiree Med. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 447-448 (7th Cir. 2011) (dismissing unjust enrichment count that was dependent on fraud allegations and was not pleaded in the alternative).

damage because he did not pay for the Donated Lives. Def.'s Mem. at 22. As discussed above, however, the Donated Lives clearly have some economic value (accepting the truth of Liston's allegations), and King removed those items of value from Liston's Candy Crush account. Liston has therefore sufficiently pled the actual damage required by the ICFA. Actual damages under the ICFA must be "calculable and 'measurable by the plaintiff's loss,'" as opposed to the defendant's gain. *Morris v. Harvey Cycle and Camper, Inc.*, 911 N.E.2d 1049, 1053 (Ill. App. Ct. 2009) (quoting *City of Chi. v. Mich. Beach Housing Co-op.*, 696 N.E.2d 804, 811 (Ill. App. Ct. 1998)). Here, although Liston does not seem to allege specifically how or when he purchased so-called Replacement Lives, he needn't have done so: he has alleged that the Donated Lives have a calculable value of $.20 each, based on the ability to purchase five lives for $.99, and further alleges that he lost these lives. King's actual damage argument therefore fails.

King also argues that Liston cannot recover under ICFA because he is not a consumer and his claim lacks a consumer nexus. A plaintiff generally must allege that he or she is a "consumer" in order to state an ICFA claim. *See Roppo v. Travelers Cos.*, 100 F. Supp. 3d 636, 650 (N.D. Ill. 2015) (citing *Bank One Milwaukee v. Sanchez*, 783 N.E.2d 217, 220 (2003)). The ICFA defines a consumer as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILL. COMP. STAT. 505/1(e). But courts have also allowed non-consumers—both business and nonbusiness plaintiffs alike—to go forward with ICFA claims where they satisfy the "consumer nexus" test. *See Bank One Milwaukee*, 783 N.E.2d at 221; *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 911-12 (N.D. Ill. 2012). To satisfy that test, a plaintiff must show "(1) that their actions were akin to a consumer's actions to establish a link between them and consumers; (2) how defendant's representations . . . concerned

consumers other than [plaintiff]; (3) how defendant's particular [activity] involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers." *Roppo*, 100 F. Supp. 3d at 651 (quoting *Brody v. Finch Univ. of Health Sci./The Chi. Med. Sch.*, 698 N.E.2d 257, 269 (Ill. App. Ct. 1998)).

The Court need not evaluate whether Liston has satisfied the consumer nexus test because he has adequately alleged that he is a "consumer" under ICFA. Under that statute, the definition of "merchandise" is not a particularly narrow one; it includes "any objects, wares, goods, commodities, intangibles, real estate situated outside the State of Illinois, or services." 815 ILL. COMP. STAT. § 505/1(b). Liston alleges that he marketed Candy Crush to his friends in exchange for Donated Lives. While the Donated Lives did not flow directly from King, but rather from King to Liston's friends to Liston, the plaintiff here does allege that it was King who made the Facebook Option available to consumers and thereby represented to him and other players that they would "be able to receive and retain Donated Lives for later use." *See* Compl. ¶ 108. Liston has thus alleged that he agreed to exchange his marketing services for valuable Donated Lives, and meets the definition of "consumer" for ICFA purposes.

Nevertheless, there is a shortcoming in Liston's complaint that does preclude him, on the basis of these allegations, from pursuing a recovery under ICFA. Liston has not satisfied Rule 9(b)'s particularity requirement, and his ICFA claim is therefore dismissed on that basis.[7] Rule

---

[7] While Liston does not dispute that Rule 9(b) applies to the "deceptive" prong of that claim, he argues in his brief that King waived any argument that Rule 9(b) applies to his claim's "unfair" prong. Pl.'s Resp. at 23 & n.6. The Court rejects that argument. King argued in its memorandum in support of its motion to dismiss that Liston had not alleged "fraud or deception with Rule 9(b) particularity." Def.'s Mem. at 24. King did not address a separate "unfair" prong of the claim in its brief, but did argue for dismissal of the entire ICFA claim on Rule 9(b) grounds. *Id.* In addition, the Seventh Circuit has previously rejected an argument that the pleading standard of Federal Rule of Civil Procedure 8(a) should instead apply to an allegation of fraudulent conduct that was unfair under the ICFA. *Pirelli* 631 F.3d at 446-47. In *Pirelli*, the

9(b) requires that a pleading "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. Pro. 9(b). "While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading ordinarily requires describing the who, what, when, where, and how of the fraud." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (internal quotations omitted). Liston alleges in Count V that "[b]y offering the Facebook Option, King represented to Plaintiff and the Illinois Subclass members that they would be able to receive and retain Donated Lives for later use," and that this conduct constituted "unfair and deceptive practices under the ICFA." First Am. Compl. ¶¶ 108, 113. King "lulled" Liston and other Illinois users "into a false sense of security about the number of Donated Lives" they had, and intended for them "to rely on these deceptions and unfair practices" when they used the Facebook Option, Liston asserts. *Id.* ¶¶ 110, 114. But Liston fails to allege with any particularity how or when King communicated the alleged misrepresentations. Were they part of a terms of use agreement players had to accept before beginning the game? Were they delivered contemporaneously with instructions and prompts relating to obtaining Donated Lives? The complaint does not say; it does not identify any specific message formats or timeframes, nor does it allege the substance of any such message with particularity. Liston thus has failed to satisfy Rule 9(b)'s particularity requirement, and Count V is dismissed without

Seventh Circuit noted that "[w]hen a claim alleges an unfair practice, the relaxed pleading standards of Rule 8 do indeed govern." *Id.* at 446. The Seventh Circuit clarified, however, that Rule 9(b)'s requirements apply to "allegations of fraud, not claims of fraud," and found that because the conduct alleged in the complaint constituted "fraud predicated on either a misrepresentation or an omission," Rule 9(b) applied to the entire ICFA claim. *Id.* at 447. Like the allegations in *Pirelli,* Liston's allegations in Count V "sound in fraud"—*e.g.,* "King misrepresented;" "King lulled;" "King intended for Plaintiff . . . to rely"—and Rule 9(b) applies to Count V in its entirety. *See Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) ("A claim that sounds in fraud—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements.") (internal quotations omitted).

prejudice. Absent an adequate amendment to the complaint that pleads allegations of fraud with requisite specificity, Liston may not recover based on ICFA.

*  *  *

For the foregoing reasons, the defendant's motion to dismiss [31] is granted in part and denied in part. Counts I and V are dismissed without prejudice. The motion to dismiss is denied as to Counts II, III and IV, but proceedings with respect to Count II will be dependent upon and tailored to the identification of a plaintiff or plaintiffs—whether Liston or others—who may permissibly assert causes of action premised on consumer fraud statutes other than that of Illinois.

Date: May 23, 2017

John J. Tharp, Jr.
United States District Judge